# USA
## Guantánamo: Lives torn apart – The impact of indefinite detention on detainees and their families

As the unlawful detentions of 'enemy combatants' at the US detention centre at the Guantánamo Bay naval base, Cuba, enter their fifth year, Amnesty International is renewing its call for the detention centre to be closed and for all those held to be released or given fair trial according to international law and without recourse to the death penalty on the US mainland. Four years since the first transfers to Guantánamo, approximately 500 men[1] of around 35 nationalities remain held at the detention facility unlawfully. Reports from the detainees and their lawyers suggest that many have been subjected to torture or other forms of ill-treatment in Guantánamo or in other US detention centres. Some have embarked on a prolonged hunger strike, among them those who have requested not to be force-fed in order that they may be allowed to die. There have been numerous suicide attempts and fears for the physical and psychological welfare of the detainees increase as each day of indefinite detention passes.

In this document, Amnesty International relates the continuing plight of the detainees, and summarizes developments related to the ongoing hunger strike and further suicide attempts. The organization also assesses the situation of nine men who remain detained despite no longer being considered 'enemy combatants' by US authorities.

Amnesty International also examines the impact on some of the family members of the detainees, many of whom have suffered immeasurably as a result of the detentions. Finally, Amnesty International describes the consequences for some detainees who were released from Guantánamo yet continue to suffer the direct results of their experiences in US detention in Guantánamo and elsewhere.

Whilst the immediate concern is for the situation of those detainees who remain in Guantánamo, this document also points to the responsibility of the US authorities for the suffering of thousands of family members around the world whose lives have been irrevocably damaged by US policies at the base. Amnesty International believes that the US administration cannot simply ignore the consequences of its actions on those detainees who have been returned home only to face more abuse, illegal detention and the stigma of having been labelled an "enemy combatant", and denounced in such terms as "the worst of the worst" by US government officials.

---

[1] US Department of Defense news release, "Detainee transfer announced", 5 November 2005. http://www.defenselink.mil/releases/2005/nr20051105-5073.html

## 1 - The continuing hunger strike

*"I am dying here every day, mentally and physically.  This is happening to all of us",* Guantánamo detainee Shaker Aamer

On 1 December 2005 the US Department of Defense (DoD) estimated the number of long term participants in the ongoing hunger strike at Guantánamo - described among the guards as 'voluntary fasting' – to be between thirty to thirty-three[2].  Of those, twenty-two were said to be receiving liquid nutrition through a nasal tube.  The DoD also stated that the intravenous and nasogastric feeding methods being used are humane and within common standards of medical care and that only in rare cases were the tubes inserted against the detainees' will, "Some, because of their character and temperament, they would be less than cooperative and would need to be restrained". [3]

Some of the detainees' lawyers have given much higher numbers of those participating in the hunger strike. The mixed reports may relate to the US authorities' definition of what constitutes a hunger strike.  In Guantánamo detainees are considered to be officially on hunger strike only when they have missed nine consecutive meals. Lawyers representing detainees in Guantánamo have told Amnesty International that some are accepting one of these nine meals in order not to be force-fed or given medical treatment.

According to the US official figures the numbers participating in the hunger strike peaked at 131 around the fourth anniversary of the 11 September 2001 attacks in the USA.

Statements made by Guantánamo officials at the time the figures were released demonstrate the continued stigmatization of the men, and assumptions that all those detained are linked to those attacks.  "One has to really kind of scratch their head and ask why would they pick the anniversary on 9/11 (to protest their detention)." said Guantánamo Deputy Commander Brig. Gen. John Gong, his question apparently answered by Army Lt. Col. John Lonergan whose unit provides security at Guantánamo, "It's their little contribution to the cause."[4]

US officials have also stated that the number of those participating in the hunger strike fluctuates and announced that towards the end of 2005 another 46 men began refusing their food.[5] Lieutenant Colonel Jeremy Martin, a Guantánamo spokesperson, has dismissed the protest, "This is consistent with al-Qaeda training and reflects detainee attempts to elicit media attention and bring pressure on the United States government."[6]

Such attitudes call into doubt the veracity of official claims to be prioritizing the physical welfare of the detainees.  Certainly the US administration's account of the current hunger

---

[2] American forces information service, news articles, "Guantánamo Tube Feedings Humane, Within Medical Care Standards", 1 December 2005
http://www.defenselink.mil/news/Dec2005/20051201_3504.html,
[3] As above
[4] As above
[5] Joint Task Force Guantánamo, press release, "JTF Guantánamo updates voluntary fast numbers", 29 December 2005, http://www.southcom.mil/pa/Media/Releases/PR051229.pdf
[6] 'Camp X-Ray hunger strikers dismissed as publicity stunt' Times Online, 30 December 2005

strike differs from that of some of the participating detainees who have been able to relay their version of events through their lawyers.

Amnesty International neither opposes nor recommends forcible feeding of prisoners on hunger strike. However, if forcible feeding is done in such a way as deliberately to cause suffering, Amnesty International considers that this may constitute cruel, inhuman or degrading treatment.

**Fawzi al-Odah** is one of those who have been participating in the hunger strike since 8 August 2005. He has been force-fed but despite this, his weight dropped dramatically to the point at which in November 2005, independent doctors who had seen his medical records advised his lawyers that he was in imminent danger of death or at least permanent organ damage. He has described the method by which he was force-fed: "The nurse shoved a tube up my nose so quickly that I began choking, bleeding from the nose and spitting blood. They used no anaesthetic". He went on to describe the subsequent treatment,

*"Frequent loud noises are made during the night time while I am trying to sleep and harsh physical handling by guards and nurses. I am told all of these things are being done because I am on the hunger strike."[7]*

As far as Amnesty International is aware, Fawzi al-Odah was still participating in the hunger strike as of 23 January 2006. His lawyers have said that, at the time of their last visit in December 2005, he was extremely thin but stable. He has told them that he plans to continue his hunger strike until he is returned to Kuwait.

Saudi Arabian national **Yousuf al-Shehri** has also described the situation for the hunger strikers. He said that, after approximately seven days without food, he and four other prisoners were taken to the camp hospital where they were verbally insulted and placed in shackles or other restraints on their arms, legs, waist, chest, knees and head. After this he said they were given intravenous medicine and described how, if they moved, they were hit in the chest area. His lawyers have described how Yousef al-Shehri, who is believed to have been a juvenile when first detained, was forcefully administered the nasal tube for feeding, reportedly with no anaesthetic gel or sedative.

Two or three days later, as he was being given liquid supplement through the tube, he said that he and other prisoners were,

*"vomiting up substantial amounts of blood. When they vomited up blood, the soldiers mocked and cursed them, and taunted them with statements like 'look what your religion has brought you.'"[8]*

---

[7] Declaration of Fawzi al-Odah to his lawyer, 10 October 2005
[8] Majid Abdulla al-Joudi *et al.,*Petitioners/Plaintiffs v. George W. Bush *et al.,* Respondents/Defendants. Civil Action No. 05-0301 (GK)

After two weeks of force-feeding, the detainees said that they were transferred from the hospital and placed in solitary cells.  After five days they described being transferred to a different area with foam walls, and a hole in the floor for a toilet.  Here they allege that the guards began inserting larger, thicker tubes into their noses again reportedly with no anaesthetic gel or sedative.  According to Yousef al-Shehri, when the tube was removed, blood came gushing out of him and the detainees were reportedly told by the guards that these techniques were being used on purpose to make them stop the hunger strike.  As of 23 January 2006, Yousef al-Shehri was still participating in the hunger strike.

The UN Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Manfred Nowak, referring to reports about the force-feeding, declared that if the allegations are true it would amount to cruel treatment.[9]  If the above allegations from the Guantánamo hunger strikers are true, Amnesty International would consider their treatment to constitute torture or other ill-treatment.

The demands of the Guantánamo hunger strikers are not controversial, they are asking for their rights under international law to be respected, they are asking to be released if they are not to be charged with internationally recognized offences and they are asking that organizations such as Amnesty International be granted access to them.  After four years without these rights, they know that the US administration is not likely to cede to their demands, which may be why some of the Guantánamo hunger strikers have expressed their resolve to continue their strike until the bitter end.  UK resident **Benyam Muhammad al-Habashi**, for instance, told his lawyer of his own determination when he resumed his hunger strike in August 2005, *"I do not plan to stop until I either die or we are respected…People will definitely die."[10]*

In a written statement to his lawyer, Saudi Arabian national **Shaker Aamer**, who had been resident in the UK from 1996 until his detention in Afghanistan in January 2002, explained his reasons for participating in the hunger strike,

*"I am dying here every day, mentally and physically.  This is happening to all of us.  We have been ignored , locked up in the middle of the ocean for four years.  Rather than humiliate myself…I would rather hurry up a process that is going to happen anyway…I would just like to die quietly by myself…I want to make it easy on everyone. I want no feeding, no forced tubes, no 'help', no 'intensive assisted feeding'.  This is my legal right."[11]*

---

[9] BBC News, "UN concern at Guantanamo feeding", 30 December 2005, http://news.bbc.co.uk/2/hi/americas/4569626.stm.
[10] 'Hunger strikers pledge to die in Guantánamo' 'The Guardian' 9 September 2005
[11] Statement of Shaker Aamer to his lawyer, 7 November 2005

**2 – Suicide attempts - the cases of Jumah al-Dossari and Muhammad Saad Iqbal al-Madni**

© Private. Jumah Mohammed
Abdul-Latif Al-Dossari.

**Jumah al-Dossari** was seized in Pakistan in late 2001 and held for several weeks by the Pakistani authorities. He was then taken in an airplane by US agents to Kandahar airbase in Afghanistan. Throughout his detention in Pakistan, Afghanistan and Guantánamo, he claims to have been subjected to torture and ill-treatment, including beatings, rape and death threats, prolonged isolation, exposure to extreme cold, sexual assaults and having his body smeared with menstrual blood during the course of an interrogation.[12] He is believed to have attempted suicide at least nine times. On 15 October 2005, he attempted to hang himself after going into the toilet during an interview with his lawyer. In declassified notes from a meeting with the lawyer in November, Jumah al-Dossari talked about this suicide attempt, explaining that he had wanted to kill himself so that he could send a message to the world that the conditions at Guantánamo are intolerable. He added that he tried to do it in a public way so that the military could not cover it up and his death would not be anonymous. This suicide attempt left him with a broken vertebra and fourteen stitches in his right arm.

Shortly after this suicide attempt, medical experts warned that if Jumah al-Dossari's conditions of confinement remained as they were, his mental state would "likely continue to deteriorate and there will remain a great likelihood that he will again attempt to harm himself physically."[13] On 14 November, just two days after his lawyers met with him and described his condition as "very frail, most likely as a result of his multiple suicide attempts and the fact that he is currently participating in the hunger strike" Jumah al-Dossari attempted to commit suicide again by attempting to re-open a wound from a previous attempt to take his own life. Authorities at Guantánamo have confirmed in a letter to his lawyer that Jumah al-Dossari attempted to hurt himself again on 12 December when he "again attempted to open the existing wound on his right arm and lacerated his right bicep."[14]

---

[12] Jumah al-Dossari's own full account of his experiences at Guantánamo and elsewhere are available in *USA: Days of adverse hardship in US detention camps – Testimony of Guantánamo detainee Jumah al-Dossari* (AI Index: AMR 51/107/2005) published by Amnesty International, December 2005. http://web.amnesty.org/library/Index/ENGAMR511072005
[13] Declaration of Stuart Grassian, M.D. in Isa Ali Abdulla alMurbati *et al* v. George Walker Bush *et al.*, Civil Action No. 04-1277 (RBW)
[14] US Department of Justice, vie email to Jumah al-Dossari's lawyer, 15 December 2005

Jumah al-Dossari had been held in solitary confinement in Camp V, the worst of the current facilities at Guantánamo which is based on the harsh 'supermaximum' style facilities on the US mainland.[15]  On 15 December 2005, just one day before a US District Court in Washington was scheduled to hear a case challenging his conditions of detention, he was moved out of isolation in Camp V and transferred to Camp 1 where he is now believed to be able to interact with other detainees.

**Muhammad Saad Iqbal al-Madni** is also reported to have attempted suicide on at least one occasion during his detention at Guantánamo.  Amnesty International has serious concerns for his physical and psychological welfare.

Muhammad Saad al-Madni was arrested in Indonesia on 12 January 2002 and subsequently transferred to detention in Egypt where he "disappeared" and was thought to have died until he resurfaced in Guantánamo in 2004.  Former Australian Guantánamo detainee Mamdouh Habib who was held with Muhammad Saad al-Madni in Egypt has recalled how he had pleaded for human interaction whilst at Guantánamo.  Mamdouh Habib was held in a nearby cell and recalls overhearing him saying, 'Talk to me, please talk to me…I feel depressed…I want to talk to somebody…Nobody trusts me."  Mamdouh Habib has described Muhammad Saad al-Madni as having gone 'fully crazy…he doesn't know where he is anymore."[16]

Muhammad Saad al-Madni does not have a lawyer representing him, and there is little information available regarding his current situation.  However Amnesty International has spoken to one former Guantánamo detainee, Russian national Rustam Akhmiarov, who was held in a cell next to a man whom he named as 'Saad' who had been arrested in Indonesia and was detained with Mamdouh Habib in Egypt.  Because of the similar case information, Amnesty International believes this man may be Muhammad Saad al-Madni who remains held in Guantánamo.

According to Rustam Akhmiarov, 'Saad' was in a particularly bad mental and physical situation at Guantánamo and at the time of Rustam Akhmiarov's release in March 2004, was passing blood in his faeces.  Rustam Akhmiarov also told Amnesty International that 'Saad' had spoken of his time in an underground cell in Egypt, where he never saw the sun and where he was tortured until he confessed to working with Osama bin Laden.  'Saad' had also reportedly recalled how he was interrogated by both Egyptian and US agents in Egypt and that he was blindfolded, tortured with electric shocks, beaten and hung from the ceiling. Rustam Akhmiarov also recalls hearing US officials tell 'Saad', during his Guantánamo detention that 'we will let you go if you tell the world everything was fine here."

---

[15] In Camp V detainees are held in solitary confinement in concrete cells, often for up to 24 hours a day
[16] 'Terror suspect's ordeal in US custody' New York Times, 18 December 2005

### 3 - 'No longer enemy combatants' still detained

There are believed to be nine men now determined no longer to be 'enemy combatants'[17] who remain detained in Guantánamo despite a decision by US authorities at Guantánamo that they should be released and despite a District Court ruling in two of the cases that their continued detention at Guantánamo is unlawful.  They are held in Camp Iguana, the facility at Guantánamo once used to hold juvenile detainees.[18]

Among the men are five ethnic Uighurs from China and another ethnic Uighur from Saudi Arabia.  All six are believed to be at high risk of further human rights violations, including torture and possible execution, if returned to China.  The other three men are believed to be from Uzbekistan or Russia, Algeria and Egypt.  It is unclear whether the US authorities have also determined that these three men cannot be returned to their home countries because they risk further human rights violations.  What is clear, however, is that they remain locked up in Guantánamo's Camp Iguana despite no longer being considered 'enemy combatants'.

On 12 August 2004, the then US Secretary of State Colin Powell said that none of the ethnic Uighurs held in US military custody in Guantánamo Bay, would be returned to China, stating that  "the Uighurs are a difficult problem and we are trying to resolve all issues with respect to all detainees at Guantánamo. The Uighurs are not going back to US China, but finding places for them is not a simple matter, but we are trying to find places for them…and, of course, all candidate countries are being looked at."[19]

Amnesty International welcomes such a declaration, which it interprets to include not only protection from forcible return to China, but also from relocation or resettlement to a third country from where they might face the risk of forcible return to China. However, the organization continues to maintain that there is no basis for their continued detention in Guantánamo and that they should be immediately released

Abu Bakker Qassim and Adel Abdul Hakim are Uighurs, natives of China's north-western Xinjiang Uighur Autonomous Region.  They were captured by Pakistani security forces in

---

[17] The US government continues to maintain that it is entitled to hold people as "enemy combatants" in connection with the war in Afghanistan and the continuing threat to US national security posed by *al Qa'ida* -. The designation of such status has been used to justify detention without little or no access to the courts, on the decision of the executive, for an apparently indefinite period. International law does not permit people to be detained at the unfettered discretion of the executive, even in time of war or national emergency.

19 US Department of State, Roundtable with Japanese journalists, 12 August 2004, http://www.ncgub.net/Int'l%20Action/US%20Dept%20of%20State%20roundtable%2012%20Aug%20 2004.htm

late 2001 or early 2002 and handed over to US custody in Afghanistan where they were held for approximately six months before being flown to Guantánamo as 'enemy combatants'. In March 2005 a Combatant Status Review Tribunal (CSRT)[20] determined that they should no longer be classified as 'enemy combatants'. The three other ethnic Uighurs from China who are no longer considered to be 'enemy combatants' are Ayob Haji Mamet, Ahmed Doe and Aktar Doe.

The US authorities have long been trying to find a solution whereby a third country would accept to resettle the Uighurs, to date without success. For the men who have been cleared by the CSRT process, the reason for their continued detention is now given as "the Executive's necessary power to wind up wartime detentions in an orderly fashion."[21] At a hearing on 12 December 2005 in the US District Court for the District if Columbia, the US authorities asserted that progress is being made on the cases but declined to elaborate except *in camera.*

On 22 December 2005 a federal judge ruled that the continued indefinite imprisonment of Abu Bakker Qassim and Adel Abdul Hakim at Guantánamo was unlawful. However, the court was not in position to order their release on parole until the government could arrange for their transfer to another country. The ruling held that their release onto the US mainland would have national security and diplomatic implications beyond the competence or authority of the court. The judge noted that,

*"Ordinarily, a district judge reviewing a habeas petition does not need to proceed very far beyond determining that the detention is unlawful before ordering a petitioner's release…The question in this case is whether the law gives me the power to do what I believe justice requires. The answer, I believe, is no."* [22]

**Saddiq Ahmed Turkistani** also remains held at Guantánamo even though he is no longer considered to be an 'enemy combatant'. Saddiq Turkistani is an ethnic Uighur who was born in Saudi Arabia – his family are thought to have fled to Saudi Arabia to escape the violent repression of the Uighurs by Chinese authorities. He says that he was exiled and stripped of his Saudi Arabian citizenship in 1997 after being arrested on drug possession allegations.

---

[20] The "Combatant Status Review Tribunals" (CSRT) which determine the status of Guantánamo detainees rely on flawed process, including the admissibility of evidence extracted under torture or other ill-treatment in making its determinations. The detainee has no access to secret evidence used against him in this process or to legal counsel to assist him. For further information see 'USA – Guantánamo and beyond' pps 54-64, AI Index AMR 51/063/2005, May 2005
[21] Resp't Supplemental Mem. At 12, quoted in United States District Court for the District of Columbia, Abu Bakker Qassim, *et al.* v. George W. Bush *et al.*, Civil Action No. 05-0497 (JR), Memorandum of 22 December 2005
[22] United States District Court for the District of Columbia, Abu Bakker Qassim, *et al* v. George W. Bush *et al.*, Civil Action No. 05-0497 (JR), Memorandum of 22 December 2005

According to him Saudi Arabian authorities then sent him to Afghanistan where he and a friend were accused of attempting to kill Osama bin Laden and held by the Taliban for four years before being released by invading US forces. After meeting with United Nations officials and participating in a press conference he was, however, then taken to the US military base in Kandahar and later transported to Guantánamo where he was held in solitary confinement for one and a half years. He has also reportedly described being repeatedly abused by guards, and subjected to psychological abuse by medical staff.

In January 2005 Saddiq Ahmed Turkistani was told by US officials that he was 'no longer an "enemy combatant"'. However, having lost his Saudi Arabian citizenship he is unable to return to the country of his birth and it is believed that no other country has agreed to accept his resettlement.

The nine men in Camp Iguana remain in limbo. Little or no progress appears to have been made on resettlement to another country or release onto the US mainland. Amnesty International considers that the primary responsibility for finding a durable solution to the plight of the nine men in Camp Iguana rests with the US authorities. As a state party to the 1967 Protocol relating to the Status of Refugees, the US government needs to ensure that it accords full respect to the institution of asylum. The organisation urges the US authorities to provide persons determined no longer to be "enemy combatants" with prompt and unhindered access to independent legal advice to establish whether they wish to claim asylum in the United States. They should grant any person wishing to submit an application for asylum with full access to fair and effective procedures that are in compliance with refugee law principles and standards including the opportunity to contact UNHCR. The US government should further facilitate the exercise of UNHCR's duty of supervising the application of the provisions of the 1967 Protocol in the case of persons seeking asylum currently held in Guantánamo Bay.

Amnesty International urges the US authorities to intensify their efforts to find a timely durable solution for those held in Guantánamo who make an informed decision not to seek asylum in the US. Such a solution should effectively address their protection needs and take into account their specific situation on a case-by-case basis. It also recommends that UNHCR cooperates with the US authorities in their search for a durable solution for Guantánamo detainees, including but not limited to Chinese nationals.

**4- The continued plight of former Guantánamo detainees**

*"He returned from Guantánamo with his health absolutely ruined…he left his health in Cuba…he was given the stigma of being an international terrorist…he is still being watched…it happens to all of them."* Fatima Tekaeva, mother of former Guantánamo detainee Rasul Kudayev

Even for some of those former Guantánamo detainees who have been released or transferred to their home countries the consequences of their experiences in US detention in Guantánamo

and elsewhere will always remain.  For some, transfer from Guantánamo has meant nothing more than a move from one place of indefinite, unlawful detention to another. For others it has meant continual harassment, arbitrary arrest and ill-treatment.  Even for those who have been returned to their home country to be reunited with their families and friends, the physical and psychological reminders of their time in Guantánamo will remain, and the stigma of having been labelled an 'enemy combatant', 'the worst of the worst' will stay with them for the rest of their lives.

Jordanian national **Wisam 'Abd al-Rahman Ahmed** was returned to Jordan from Guantánamo in April 2004.  According to the US Department of Defense, the decision to transfer or release him was, "based on many factors, including whether the detainee is of further intelligence value to the United States and whether he is believed to pose a threat to the United States"[23].  Following his release he described to the media how he had been arrested in Iran on 1 March 2002, handed over to the Afghani authorities and held in an underground prison for 14 months.  Before being sent to Guantánamo he was transferred to Bagram where he says,

*"At Bagram, we arrived – with our heads covered in plastic bags, legs shackled and hands cuffed - to a flood of insults, swear words, kicks and sexual abuse…The US jailers used to let loose their dogs to intimidate and provoke us, taking delight in seeing us gripped with fear. They also forced us to take off our clothes and stand in a way I'm ashamed to describe. We regularly underwent anus checks, which was the most humiliating."[24]*

Amnesty International has not had the opportunity to interview Wisam 'Abd al-Rahman Ahmed.  Following a brief spell of liberty, he was rearrested in Jordan on unknown charges. He is currently held in an unknown location where, Amnesty International fears, he may be at risk of torture or ill-treatment.

Yemeni national **Karama Khamis Khamisan** was returned to Yemen from Guantánamo on 22 August 2005.  In an interview with Amnesty International just a few weeks after his transfer he described how he had travelled to Afghanistan as part of a drug smuggling ring where he was held by drugs barons as a human guarantor until completion of the deal.  When US forces invaded Afghanistan he described how, fearing discovery, his captors fled leaving he and the other guarantors stranded near the Afghanistan-Pakistan border.  It was here that he says he was seized by Pakistani nationals, who sold him on to US forces who held him first in Bagram, then Kandahar and later transferred him to Guantánamo.

During his detention by US forces in Afghanistan, Karama Khamisan said that he was kicked and beaten while hooded, stripped naked and beaten with batons.  He told Amnesty International that in Kandahar he and a group of other detainees were stripped and piled on

---

[23] 'Detainee transfer completed' DoD news, http://www.defenselink.mil/releases/2004/nr20040402-0505.html
[24] 'Jordanian describes hell at US prisons', Islamonline.net, 5 July 2004

top of each other naked, whilst the US officials, in full military uniform laughed at them and took photographs of the pile of naked bodies. He also said that he was threatened with electric shocks and later, on the flight from Afghanistan to Guantánamo handcuffed so tightly that, when the handcuffs were removed, some of his flesh was also torn off.



© AI. Karama Khamisan photographed in Yemen during AI's mission in October 2005.

In Guantánamo, Karama Khamisan described how, on one occasion, he was taken to the shower room where guards attempted to sexually abuse him. As he pushed them away, ten guards entered the room and beat him before transferring him to a solitary cell where he was held for 25 days, naked. He said that he was only taken to use the toilet and shower once in this entire period and that he ate no solid food in order to avoid having to defecate in his cell. He said that he was also threatened with transfer to Egypt or Jordan where he was told he would be tortured, he was also subjected to verbal threats and told "*we have other means and methods we can use if you don't talk.*"

Karama Khamisan was eventually determined not to be an 'enemy combatant' by US authorities and returned to Yemen. When Amnesty International met him in September 2005

he was held in the Investigating Criminal Unit, Drugs Department in Sana'a. Yemeni officials told Amnesty International that their investigations were completed and that he was due to be tried on drugs related charges 'soon'. However, in December 2005 he was transferred to the Political Security prison in Sana'a where he was held virtually *incommunicado*. His lawyer's requests to visit him and to be present during any court proceedings against him have been denied.

On their return to Russia from Guantánamo on 1 March 2004, seven Russian nationals were re-arrested and held for four-and-a-half months in detention before being released and all charges dropped. Since then, they and their families have been subjected to constant harassment and surveillance, and some of the detainees have been re-arrested and allegedly tortured by Russian law enforcement officials. **Airat Vakhitov** told Amnesty International how, in his opinion, the Russian security services now felt they had the 'moral right' to arrest him and the other returned Guantánamo detainees at random.

Nina Odizheva, the mother of former Russian Guantánamo detainee **Ruslan Odizhev** has described how the time spent in US detention had irrevocably changed her son,

  *"It changed him…he is completely ill…he lives on pills for all his major organs…he tries not to show it or tell me details so I don't get upset…he has no appetite…he is a different person now…"*

Fatimat Tekaeva, the mother of former detainee **Rasul Kudaev**, has also described how he "returned from Guantanamo with his health absolutely ruined…he left his health in Cuba". She says that because of his detention in Guantánamo, her son has now been given the 'stigma of an international terrorist'.

Rasul Kudaev was most recently detained by law enforcement officials in Russia on 23 October 2005, allegedly on suspicion of participation in an armed raid. He was reportedly beaten in front of his family members and then tortured while in detention including by being repeatedly kicked in the head.[25] He remains in detention and there are serious concerns for his health, due to the injuries he has sustained, and the reported denial of adequate medical treatment for his existing serious health problems. His state-appointed lawyer was removed from his case after she filed an official complaint that he had been tortured.

**5 – Impact on families**

Four years after the first transfers to Guantánamo, US authorities have failed to provide a full list of names and nationalities of those detained there. Even the numbers of those who remain detained are given only as an approximation by the US Department of Defense. Incomplete lists have been compiled by media, lawyers and NGOs, but still, to date, there is no official

---

[25] See AI Urgent Action EUR 46/041/2005, 27 October 2005 and update EUR 46/061/2005 , 8 December 2005

list of all those detained.  Some families who have received no direct communication from the camp, and are aware that their relatives are, or have been detained by the US, remain in a state of uncertainty as to the fate of their relatives.

In early 2002, Yemeni authorities published a list of Yemeni nationals reportedly held in Guantánamo.  Amongst those listed were **Ismail Ali Ahmed al-Rimi**, but his family have never received confirmation that he is actually present in Guantánamo nor have they received any communication from him.  For families like these, speculation that their relatives may be in Guantánamo is just one lead in the search for their relatives, but without formal notification from either the US or Yemeni authorities the pain of not knowing continues



© Amnesty International. The children of Ismail al-Rimi photographed in Yemen during AI's mission, September 2005

Ismail al-Rimi's family told Amnesty International that he was approximately 30 years old when he "disappeared" shortly after 11 September 2001.  He is married with two children, Muhammad (6) and Abdullah (10) and had been working in Dubai, United Arab Emirates (UAE) since November 1999. His family had spoken to him on the telephone just before 11 September 2001 and they had discussed his plans to return to Yemen.  They have not heard from him since.

Six months after that telephone call his brother saw his name published in the Yemeni media in a list of Guantánamo detainees. However, they told Amnesty International that when they contacted the International Committee of the Red Cross (ICRC) at the time, they were told he was not in Guantánamo, nor have they received any responses to their letters to Guantánamo.

In order that the family of Ismail al-Rimi – and others like them – can begin to establish his fate and whereabouts, Amnesty International is again calling on the US authorities to publish a full list of all those they are holding as part of the 'war on terror' at Guantánamo and elsewhere.  They should also provide all detainees with adequate means of communication with their family members who should, in turn, be entitled to full information as to their relatives' health and well-being.

The UN Human Rights Committee has held that the suffering of family members of "disappeared" persons resulting from the authorities' denial of their right to know what has

happened to their relatives could amount to torture or ill-treatment.[26] Similarly, the European Court of Human Rights affirmed that the silence of the authorities in the face of the anguish and distress experienced by family members of a "disappeared" person could amount to inhuman or degrading treatment.[27]

For some family members of the Guantánamo detainees, their suffering has been compounded by false hopes because of erroneous media reports or misunderstandings. Particularly for those who have been unable to rely on their own governments – let alone the US authorities – to provide them with detailed, up-to-date information on the situation of the detainees, the media has often been the only source of information from the moment they began their search for their relatives.

Their stories highlight the failure of the US administration to keep other governments fully informed of the legal status and well being of their citizens. Officials of other governments have sometimes also failed to ensure that family members of the Guantánamo detainees are kept accurately informed of developments.

Anyone who is arrested, detained or imprisoned has the right to inform, or have the authorities notify, their family or friends.[28] The right of detainees to notify relatives of their detention is complemented by the right of people outside to obtain information about the detainees.[29] Contact with the outside world should be allowed at regular intervals during detention.[30] This is essential not only as a safeguard against torture and ill-treatment, but in order to respect the detainees' right to family and private life (International Covenant on Civil and Political Rights, Article 17). In particular, families should be informed of the death, serious illness, serious injury or transfer of their relatives, and detainees should be informed at once of the death or serious illness of any member of their family.[31]

Foreign nationals are also to be given all reasonable facilities to communicate with and receive visits from representatives of their government.[32]

---

[26] Human Rights Committee, Communication No. 107/1981 (Elena Quinteros Almeda and Maria del Carmen Almeida de Quinteros v. Uruguay), Views of the Human Rights Committee under article 5, paragraph 4 of the Optional Protocol to the International Covenant on Civil and Political Rights, UN Doc. CCPR/C/19/D/107/1981, 21 July 1983, par. 14

[27] European Court of Human Rights, *Kurt v. Turkey* (application no. 24276/94), Judgment of 25 May 1998, *Reports of Judgments and Decisions*, 1998-III, par. 134. *Cyprus v. Turkey* (application no. 25781/94), Judgment of 10 May 2001, *Reports of Judgments and Decisions*, 2001-IV, par. 157.

[28] Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Principle 16(1). Standard Minimum Rules for the Treatment of Prisoners, Rule 92.

[29] Declaration on the Protection of All Persons from Enforced Disappearances, Article 10(2).

[30] Standard Minimum Rules for the Treatment of Prisoners, Rule 37. Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Principle 19.

[31] Standard Minimum Rules for the Treatment of Prisoners, Rule 44.

[32] Standard Minimum Rules for the Treatment of Prisoners, Rule 38. Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Principle 16(2).

When Rabiye Kurnaz heard media rumours that her son **Murat Kurnaz**, German resident and Turkish national, had been released from Guantánamo and sent to Turkey, she and her other children packed their bags and, along with their lawyer, travelled to Turkey in the hopes of being reunited with her son.  However, her hopes were dashed when the rumours of his release proved to be unfounded.



© Amnesty International. Rabiye Kurnaz, mother of Guantánamo detainee Murat Kurnaz at the AI/Reprieve London Conference, November 2005

In fact Murat Kurnaz, who has lived his whole life in Germany, has not left the confines of the detention centre at Guantánamo for four years. Assistance from the German authorities towards the family's struggle for support and information has, to date, not been forthcoming at all.  It is only after years of campaigning by his lawyers, family members and Amnesty International that the German authorities have finally accepted that, if Murat Kurnaz is released from Guantánamo, he will be allowed to return to Germany.

On 18 December 2005, Germany's Interior Minister Wolfgang Schaeuble added his support to those who have called for the detention centre at Guantánamo Bay to be closed.  In an interview with the German newspaper Frankfurter Allgemeine, he stated that he had, "…told my U.S. partners time and again: What hurts the reputation of the United States most is that they detain terrorism suspects in camps outside the U.S. judicial system."[33]

In January 2006, just a few days before a visit to the USA for talks with President Bush, Germany's Chancellor Angela Merkel added that "An institution like Guantanamo can and should not exist in the longer term…Different ways and means must be found for dealing with these prisoners."[34] Amnesty International continues to urge the German authorities, to do all within their power to secure justice for Murat Kurnaz and to keep his mother and other

---

[33] United Press International, "German Interior Minister: Close Guantanamo", 19 December 2005, http://washtimes.com/upi/20051219-070454-1884r.htm

[34] 'Merkel criticises Guantánamo Bay'  BBC News, 7 January 2006

family members fully informed of developments and outcomes of any discussions with US authorities.

In September 2005, Amnesty International met with the family of Yemeni national **Muhammad al-Assadi** who is currently detained in Guantánamo. Despite the similarity of names, he is not the same man as Muhammad al-Assad who has featured in a previous Amnesty International report.[35]

At the time of the meeting, recent media reports in Yemen had named five men who were said to have been returned from Guantánamo Bay. In fact, only two of those five men mentioned had been returned from Guantánamo, the other three men named had been returned from a US secret detention site - possibly one of those rumoured to have been based in Europe. With the media and Yemeni officials erroneously reporting the facts, the family of Muhammed al-Assadi strongly believed that he was back in Yemen and were hopefully awaiting good news from the Yemeni authorities.

Several news reports in Yemen had listed the returned Guantánamo detainees as Walid al-Qadassi, Karama Khamisan, Muhammad al-Assad, Salah Nasser Salim Ali and Muhammad Bashmilah. The last three men named had, in fact, never been held in Guantánamo, but with the similarity of names, Muhammad al-Assadi's family were convinced he was back in his home country and that they would be reunited with him soon.

Unfortunately they were wrong. Muhammad al-Assadi remains held in Guantánamo and very little information is available as to his current situation. Despite their requests for information, Yemeni officials had failed to inform Muhammad al-Assadi's family that their son was not one of those who had been released.

For others, notably those in Kuwait, Bahrain and Saudi Arabia, the past few years have been fraught with false promises and shattered expectations regarding the return of their relatives. In the past four years there have been several government or media announcements that at least some of the detainees in those countries would be returned imminently. When three of the six Bahraini detainees were finally returned in November 2005, the families did not know, until the very last minute, which of the men were returning, leaving all in a state of uncertainty culminating in joy for some, despair for others. It is not clear whether this points to a failure of communication on the part of the US authorities. What is clear, however, is that as the government responsible for the unlawful detention of all the Guantánamo detainees, the USA must take ultimate responsibility for the suffering caused, not only to the detainees themselves, but to the thousands of family members also affected.

Some of the Guantánamo detainees have children who they have never met. Some detainees do not know that their mother or father has died since they were detained and others will

---

[35] Amnesty International, USA/Yemen: Secret detention in CIA 'Black Sites', AMR 51/177/2005, 8 November 2005. http://web.amnesty.org/library/Index/ENGAMR511772005

know only that their prolonged absence has caused their dependents financial hardship and severe psychological distress.  Amnesty International has received reports of family members who have been hospitalized for problems which they believe are directly related to the Guantánamo detentions.

 *"Dear Mr Tony Blair,*

*Firstly, how are you? I sent a letter two years ago, why didn't you reply?!? I was waiting for a long time but you did not reply. Please can you give me an answer to my question? Why is my dad in prison? Why is he far away in that Guantánamo Bay?! I miss my dad so much. I have not seen my dad for three years. I know my dad has not done anything, because he is a good man. I hear everybody speak about my dad in a nice way. Your children spend Christmas with you, but me and my brothers, and sisters have spent Eid alone without our dad for 3 years. What do you think about that?  I hope you will answer me this time. Thank you, From: Anas Jamil al-Banna, 9 years old"*

Anas al-Banna, the son of **Jamil al-Banna**, resident of the United Kingdom (UK), detained in Guantánamo, was six years old when he first wrote to Tony Blair asking about his father.  He never received a response and recently sent the above follow-up letter.

UK nationals who have been released from Guantánamo told Amnesty International that Jamil al-Banna had been told two years ago that he would be going home 'soon'.  According to them, most of his time in detention he has been worrying about his family.  According to those released, it was a particularly difficult time for him when he learnt that he was not to be among those from the UK to be released. His eldest son Muhammad wrote a message to his father in November 2005,

*"My dear dad…you are the light in the darkness…my love for you is growing…when I pray, I pray for you with all my heart…your son has grown up and he knows everything that has happened…God willing you will come back and bring back our smiles."*

For the family of Jamil al-Banna, as for many of the Guantánamo families, the media and information from returned detainees have been the main source of information regarding his current situation and state of health. According to Jamil al-Banna's wife, one day Muhammad came home from school feeling particularly sad and angry and asked her "Is it true that my dad is being tortured and they are doing bad things to him?"  When asked where he had heard this, he told his mother that a boy at school had heard radio reports about torture and beatings at Guantánamo.

For the family of Jamil al-Banna, the past three years have been marked by uncertainty and the pain of not knowing when they will be reunited. Their suffering demonstrates the wider reach of the devastation caused by the US 'war on terror' policies in Guantánamo and beyond.

In a statement delivered to an Amnesty International/Reprieve conference in November 2005,[36] his wife described her family's anguish,

*"My pen cannot express the pain and sadness I feel in my heart for what my family has been going through…My pen doesn't know where to start with the tragedy that I've been living through with my five children, without a family or a husband. For three years, my children and I have been suffering this injustice. They have not only treated my husband unjustly…but they have treated my children and me even more unfairly. I cannot tell you just how exhausting and worrying the past three years have been for me… The only thing I can think about is my children and my husband. I do not even think of myself, it's the last thing on my mind"*

As with the al-Banna family, for many families the detention of their sons, brothers and husbands marked the beginning not only of years of pain, uncertainty and hardship but also the beginning of years of campaigning on behalf of their relatives.

Rabiye Kurnaz has, for instance worked with lawyers, media and human rights organizations in her campaign for justice, yet still she feels that she is not doing enough for her family.  She has described to Amnesty International her physical and emotional exhaustion and her feelings of guilt that "as a mother I cannot help my children… they ask 'when is our brother coming back mamma?'"

Nadja Dizdarevic, wife of Bosnian Guantánamo detainee **Boudella al-Hajj** (originally of Algerian origin but now a citizen of Bosnia and Herzegovina) has also described how she has dedicated her life to the campaign for the release of all the Bosnian detainees, but feels that, as a consequence, she has neglected her children. Nadja Dizdarevic has organized numerous demonstrations in Bosnia and Herzegovina and has been a leading and outspoken activist on her husband and others' behalf.

Many of the other family members in Bosnia and Herzegovina are reluctant to speak out, for fear of reprisals. Nadja Dizdarevic herself has received several threatening telephone calls, which in January 2003, she had reportedly been able to trace to a Ministry of Interior police headquarters in Sarajevo. On 25 May 2004 she was attacked in her own home by unidentified assailants.

On 5 December 2005, in protest at her husband's treatment and at the failure of the Bosnia and Herzegovina authorities to take concrete steps towards securing the men's release from Guantánamo, Nadja Dizdarevic began her own hunger strike, saying that she would begin eating again only after receiving written promises from the Bosnian authorities that they would raise the issue with the US administration.  On 9 December 2005, after fainting in front

---

[36] Amnesty International/Reprieve – The Global Struggle against Torture: Guantánamo Bay, Bagram and Beyond.  19-21 November 2005

of the parliament building in Sarejevo, she was transferred to hospital.  She has now been released from hospital and has suspended her hunger strike on the advice of doctors.



© Amnesty International. Nadja Dizdarevic, wife of
Guantánamo detainee Boudella al-Hajj speaking
at the AI/ReprieveConference in London, November 2005.

*"We shouldn't abandon this room, we should keep it warm until he comes back,"* Mother of Guantánamo detainee Fawzi al-Odah

After nearly four years' of detention at Guantánamo, Fawzi al-Odah reached a point at which he felt he no longer wished to go on living.  After he joined the hunger strike on 8 August 2005, Fawzi al-Odah formally requested his lawyer to file papers in US courts to seek removal of his feeding tube in order that he may be allowed to die.  His family have refused to give consent for the tube to be removed, stating that "we utterly refuse…Fawzi would not have taken such a decision unless he has lost all hope and some of his ability to reason."[37]

Fawzi al-Odah's father is the head of the Kuwaiti Family Committee and spokesperson for the families of the Kuwaiti detainees held in Guantánamo.  The Kuwait Family Committee was founded in January 2002, and together the families have organized a website dedicated to the cause of the detainees, organized demonstrations in Kuwait and London, and been at the forefront of media work aimed at securing the release or fair trial of their relatives.

---

[37] 'Parents of Cuba Kuwaiti Inmate Reject Son's Bid to Pull 'Lifeline'' Associated Press, 27 October 2005

In January 2005, Khalid al-Odah spoke of the effect of his son's detention on the family and explained the ways in which they have been able to cope with his prolonged absence. He told Amnesty International that,

*"…when I come home from work, my wife is weeping in a corner. I don't know what to do. I try to comfort her, but I awake sometimes at night and find her in Fawzi's bedroom. "We shouldn't abandon this room, we should keep it warm until he comes back," she says."[38]*

**6 – Conclusion**

Many of the Guantánamo detainees have been held in unlawful detention now for four years with little or no contact with the outside world. Some have had no contact with their families whatsoever, whilst others rely only on the occasional, often heavily censored, letters.

As demonstrated by former Guantánamo detainees who spoke at the Amnesty International/Reprieve conference in November 2005, despite their experiences many detainees have sought strength from each other, from their faith and from the hope that they would, one day, see their friends and families again. Despite the continued difficulties they have faced since their return, some of those who have been released have expressed their determination to continue campaigning on behalf of those who remain in detention.

After four years, the US administration must start listening. Guantánamo is not only just a legal black hole, it is a moral disgrace and for those affected, it is an emotional abyss. The Guantánamo detentions must not be allowed to continue for a fifth year - the hundreds of men held and thousands of their family members affected around the world must finally be afforded the justice to which they are entitled.

---

[38] Amnesty International – USA, Guantánamo: The struggle for our children…Reports of chronic abuse bring more anguish – but new reason to hope aswell, AMR 51/001/2005, 6 January 2005

**7 – Recommendations**

US authorities should:

- Release all the Guantánamo detainees unless they are to be given fair trials in US courts in accordance with international law and without recourse to the death penalty;
- Close the Guantánamo detention facility and open up all US 'war on terror' detention facilities to external independent scrutiny;
- Officially and publicly condemn torture and other cruel, inhuman and degrading treatment and order that these practices cease, making clear that they are prohibited absolutely and will not be tolerated;
- Promptly, impartially and effectively investigate all allegations of torture or other cruel, inhuman or degrading treatment of detainees in Guantánamo and in US custody elsewhere;
- Ensure that anyone responsible for having committed, ordered or authorized torture or other ill-treatment be brought to justice in a fair trial according to international law;
- Ensure that all the Guantánamo detainees are afforded appropriate medical care
- Ensure that all the Guantánamo detainees are allowed adequate contact with their families;
- Ensure that families of the detainees are kept fully informed of their legal status, health and well-being;
- Set up an independent commission of inquiry into all aspects of the USA's "war on terror" detention policies and practices;
- Provide UNHCR with prompt and unhindered access to the nine men currently held in Camp Iguana and cooperate with the agency to finding a durable solution to the plight of these individuals that addresses their protection needs and takes into account their specific situation on a case-by-case basis;
- Provide a full list of all those detained by the US as part of the 'war on terror' in Guantánamo and elsewhere.